**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Karen Pleban** | ) | **CASE NO. 1:05-cv-1088** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| Vs. | ) | |
| | ) | |
| **Lori Kokowski,** | ) | **Memorandum of Opinion and Order** |
| **Ted Kalo,** | ) | |
| **Betty Blair,** | ) | |
| **Ernie Smith, and** | ) | |
| **James Cordes** | ) | |
| | ) | |
| **Defendants.** | ) | |

**INTRODUCTION**

There are two motions presently before the Court. The first is Defendants' Motion for Summary Judgment. (Doc. 69). Defendants have also filed a Motion to Strike certain materials from Plaintiff's response. (Doc. 91). This action relates to alleged discrimination by Defendants based on Plaintiff's disability. For the reasons that follow, the Motion to Strike is GRANTED IN PART AND DENIED IN PART and the Motion for Summary Judgment is DENIED.

1

**FACTS**

Plaintiff Karen Pleban was hired by Lorain County in September 1999 as a Computer Systems Manager 2.  Defendants are Lori Kokoski, Ted Kalo, Betty Blair, Ernie Smith and James Cordes.  Kokoski, Kalo and Blair are the present Lorain County Commissioners, Cordes is the Lorain County Administrator and Smith is a Lorain County employee who once had supervisory authority over Plaintiff.

Lorain County's Classification Specification describes the Job Responsibilities of a Computer Systems Manager 2 as follows:

> Under direction, coordinates data processing activities for a county department or agency; serves as liaison between systems vendors and service personnel; operates computer systems; evaluates the need for hardware and software; prepares specifications for the purchase of computer related equipment; service bids; recommends purchases.

The Classification Specification does not explicitly mention physical lifting or the physical setup of computer systems.  However, Cordes avers that Plaintiff's basic job duties included setting up, installing, troubleshooting and repairing computers.  The Classification Specification states that the enumerated duties are "illustrative" and the employee "[p]erforms other related duties as required."

Plaintiff worked as the sole IT employee until 2001.  At that time she began to experience health problems such as back pain, difficulty walking, a severe kidney infection and trouble breathing.  It became difficult for her to perform certain tasks such as running computer cables and lifting computer equipment.   Other workers would help her with these tasks.

Plaintiff eventually contacted the Commissioners (at that time the Commissioners were Blair, Mary Jo Vasi and David Moore) seeking an assistant.  The Commissioners agreed that IT

2

was understaffed and that another employee was needed.  Commissioner Vasi and County Administrator Cordes testified that the search shifted from an assistant position under Plaintiff to an IT Director above Plaintiff.  Plaintiff was not given an opportunity to apply for the position and the position was not posted to the public.  The position went to Ernie Smith, an acquaintance of then-Commissioner Moore who had worked for a company Moore once owned and managed.

Plaintiff and Smith had a difficult working relationship.  Plaintiff thought she was getting an assistant who would help her with lifting and other physical duties.  Instead, Smith moved her out of her office and forced her to do more lifting and installation.  These issues were brought to the attention of Commissioner Vasi—who had been against Smith's hiring in the first place—and the Lorain County Human Resources Director Jeff Fogt.  They were generally supportive of Plaintiff's position and had several conversations with Smith.  Smith testified to these conversations as follows:

> On more than one occasion I was in Commissioner Vasi's office with the then HR Director, Jeff Fogt, being told that Karen Pleban was not at fault, et cetera, listening to what I thought was just complete garbage.  And I just shut my ears to it and endured the cigarette smoke and the -- whatever happened and just couldn't wait to get out of the office and then just left, made the best of it.

Plaintiff filed a number of complaints in 2002.  A June complaint stated that she had been stripped of her managerial duties "since I have notified the County Commissioners of a minor handycap [sic] of not being able to lift over 10 lbs. due to a lupus disorder."[1]  On July 9, 2002,

---

[1] Plaintiff has submitted to the Court a number of doctor's notes from later in the year.  Plaintiff's doctor provided a handwritten note in October of 2002 stating that Plaintiff could not lift over 10 pounds.  He stated in a December letter to her insurer that she had multiple medical problems, "including degenerative disc disease in her lumbar spine and probably systemic lupus with persistent joint pain."  It is not clear whether these letters were submitted to the

Plaintiff filed another complaint alleging a general pattern of harassment, intimidation and bullying at the hands of Smith.[2]  Among other things, she alleged that Smith forced her to lift heavy items in spite of her disability.  She also claimed that Smith filed a bogus reprimand in retaliation for her submission of a restriction notice from her doctor.  She submitted another complaint the next day, alleging that "a half hour after I presented Ernie Smith with a formal complaint I was served with an additional reprimand with the facts being untrue and no merit." Fogt responded to the complaints with a letter to Smith:[3]

> In response to your request for clarification on what Karen can or cannot do, I requested from Karen an update from her doctor.[4]  Her doctor has indicated that she should not lift more than 7 lbs, no ladders or stretching.  Please work with Karen and be considerate of her condition.  As I explained in our meeting, there may be many non-essential functions of her job that she will be unable to perform.
> Obviously, when the doctor says no ladders, that means no climbing of any kind and when the doctor says no stretching, that would include bending and pulling.

In a letter to Plaintiff, Smith attributed their difficulties to Plaintiff's refusal to accept that he was her supervisor.  Regarding her work restrictions, he stated that "I have asked you to do

---

County.

[2] Smith described his response to the complaint as follows:

> Q    So what did you do when you got this report from Karen Smith -- or Karen Pleban complaining about being intimidated and bullied and harassed by you, what did you do with it?
>
> A    After I got done laughing?

[3] Plaintiff claims that the Commissioners were copied on this letter.  However, the Commissioners names are merely stated on the letterhead.  The only other person who was copied on the letter was Plaintiff.

[4] The doctor's note is dated July 8, 2002 and conforms to Fogt's description.

physical work. I am aware of your medical waivers and have not insisted that you lift PC's or anything else." He testified as follows:

> Q    Were you aware that she had a condition that required accommodation in 2002?
>
> A    I was aware that she had doctor's notes, but not aware of her having a legitimate disability.
>
> Q    Your HR Director is saying you have to accommodate her?
>
> A    Well, God rest his soul, this is typical trash from Jeff Fogt to cover up and placate Commissioner Vasi to keep his ownself, body out of her office.

Joey Opdyke, a telecommunications technician with the County, met with his supervisor and Fogt. They assigned him to assist Plaintiff with running cables and lifting equipment. He received a 5% raise and assisted Plaintiff until 2004. Plaintiff claims to have had few problems during that time.

Plaintiff claims that soon after Fogt's departure in 2003 the situation began to deteriorate. Although the Commissioners and administrators were aware of Plaintiff's health issues,[5] Plaintiff was pressed to perform lifting and similar duties. County Administrator Cordes had always been concerned that other County employees were assisting Plaintiff with lifting when they should have been performing their own jobs. Smith testified that he was instructed by Cordes that Plaintiff had not been granted light duty by the Board of Commissioners and was required to be a

---

[5]    Plaintiff has submitted the declarations of former Commissioner Vasi and of former city employee Joey Opdyke. Vasi states that "[w]e knew at the Commissioners Office that Pleban had lupus, a serious health condition and required accommodation of her disease, such as assistance in lifting and not to have her climbing ladders." Opdyke states that it was common knowledge in the administration office that Plaintiff had lifting restrictions. Administrator Cordes was also aware of Plaintiff's health issues.

5

"fully functional member of the workforce."

Smith ordered Plaintiff to lift equipment on her own. On April 20, 2004, she sent a letter to the Board detailing her conditions and requesting that "the commissioners . . . place a document in my personnel file and copy to me stating that the county honors my limitations so that it is not expected of me to do excessive stretching, lifting over 7-10 lbs and any sort of climbing." She attached an earlier doctor's note as well as a job description, stating that "I am able to do everything that is listed in my job description." The County refused her request.

According to Plaintiff and co-workers, Smith then ordered others not to assist Plaintiff with lifting. Employees delivering computers and equipment were told to place them on the floor. Items were placed on the floor around her desk which she was then required to put away. She claims that some items were intentionally moved from shelves to the floor by Smith.[6] Defendants characterize the course of events differently. According to Cordes, Plaintiff would selectively "play her 'disability card'" based on her desire to perform a particular assignment.

Plaintiff was eventually forced to leave work. Plaintiff and Cordes dispute whether she was simply dismissed or placed on family medical leave. In any event, the County instructed her to obtain a current physical examination releasing her from her lifting restrictions if she wished to come back to work.[7] Plaintiff did not obtain an examination. Instead, Plaintiff's Union (the

---

[6]   Smith also asked a vendor to submit a letter stating that Plaintiff was incompetent in performing her duties. The vendor refused.

[7]   An arbitrator described this request as follows: "The Board requested that Grievant provide medical authorization by May 14, 2004, allowing her to lift the computer equipment and releasing her from the lifting restrictions in order to continue working in her present position. . . . By June 15, 2004, the Grievant had not produced the requested documentation. She was placed on leave

6

United Steel Workers of America, Local 8845) sent a letter to Administrator Cordes stating, among other things, that "Ms. Pleban's restrictions do not preclude her from performing the functions of her job and the County has no grounds to relieve her from active duty."[8]  Cordes responded to Pleban, explaining that a previous letter to her attorney "described a number of your job duties which the County was concerned you would not be able to perform.  Your letter of July 28, 2004, once again states that you are not precluded from doing these job duties.  Based on the[se] statements . . . that you can perform your job functions, the County is prepared to have you return to work."[9]

Plaintiff and the County apparently had a different idea of what she would do upon her return.  Lorain County did not grant her any accommodations for her lifting problems.  Barely a week after her return the County Prosecutor responded to a letter from Plaintiff's attorney by stating that "[t]he County has agreed to allow Ms. Pleban to refrain from climbing ladders.  Beyond that, she will be expected to perform her duties as assigned to her."  A series of

---

until such time as she provided it."

[8] The Union also filed a grievance on June 22, 2004.  The grievance was denied on March 15, 2005.  The arbitrator concluded that the County had the right to dictate her essential job functions and to request confirmation of her ability to perform those functions.  The arbitrator ruled that when the County properly placed her on medical leave when she failed to produce the requested documentation.

[9] Neither party has submitted the County's letter to the Court.  The arbitrator described the letter as "listing the physical actions that are part of the Grievant's job duties and stating that the restrictions placed on the Grievant by her physician appear to preclude the Grievant from performing nearly all of the physical actions required."  Plaintiff responded in the July 28 letter that "I have never claimed to have a medical condition that precludes me from performing my job."

disciplinary actions followed:

- September 2004 - Plaintiff was suspended one day for insubordination when she refused to move a computer under orders from Smith.  The hearing officer determined that the 2002 doctor's notes and Fogt letter were inadequate proof of a disability in light of the recent correspondence between Plaintiff and the County.

- October-November 2004 - Plaintiff was suspended for three days for refusing to pick up and carry a laptop computer.[10]  The hearing officer again noted Plaintiff's failure to obtain a recent diagnosis.

- December 2004-January 2005 - Plaintiff was suspended for five days for refusing to lift a printer.  The hearing officer again noted that the doctor's notes of 2002 were not adequate proof of an existing disability.

- January 2005 - Plaintiff refused to move her vehicle from a handicapped parking spot after being directed to do so by Smith, Cordes and County employee Karen Davis.  Despite the fact that Plaintiff had a valid handicapped parking permit, the hearing officer found that Plaintiff acted "in an insubordinate manner . . . ."[11]  Plaintiff was also spotted in a secretarial area that she was previously advised to avoid.  These incidents resulted in a 30 day suspension.

Plaintiff avers that on March 24, 2005, Smith placed a number of monitors, printers and computers around her desk and chair and ordered her to clean up the area.  She strained her back while attempting to do so and has submitted a March 29, 2005, report from St. John West Shore Hospital describing treatment for depression and chronic back pain.[12]  Meanwhile, the County

---

[10]   The disciplinary letter notes that the average laptop weighs 7.7 pounds.  Plaintiff refused to lift the laptop because her lifting restriction was 7 pounds.

[11]   Commissioner Vasi testified that during her time as Commissioner there was no policy barring individuals with valid handicapped parking permits from parking in designated handicapped spaces.

[12]   Plaintiff claims that she "was diagnosed with lupus, as well as a host of other physical conditions."  After reviewing the documents it does not appear that lupus is even mentioned.  The only statement that might be understood as a diagnosis is that "[y]our exam shows you have signs of mental depression."  Regarding her back pain, the instructions merely provided general information on

was discussing terminating Plaintiff with the County Prosecutor's Office.[13]  She was told to leave work on March 31.  Cordes has testified that on April 5 Plaintiff stated that she could not perform her job and was quitting in order to get a disability pension.  Cordes followed up on April 6 with a letter explaining that the County "is herein placing you on family medical leave based upon your self-professed medical condition that is precluding you from performing your job. . . .  If you are found ineligible for family medical leave, fail to return the application, or do not apply for and are granted another form of leave the Employer may terminate your employment."

Plaintiff filed three EEOC complaints relevant to this action.  The first was filed on August 23, 2004, and alleged the following:

> I was diagnosed with a disability in 2001.  Respondent had accommodated my reasonable accommodation request until June 14, 2004.  In July 2002, I submitted an updated doctor's restriction stating that my restriction was permanent and since that time Respondent has created a hostile work environment for me. . . .
> On June 14, 2004, I was sent home because Respondent wanted me to have my restriction lifted.  I refused to do so and filed for unemployment benefits until I was recalled to work on August 6, 2004.

A right to sue letter was issued on December 3, 2004.  A second EEOC complaint was filed November 3, 2004, alleging the following:

> Since I objected to the mistreatment by my employer and told him about my intent to file EEOC charges, I have been numerously disciplined on petty and untrue allegations.  I have even lost 2 months of work and have been suspended a couple times and currently facing another suspension. . . .  My employer furthermore has created a hostile working environment for me and the co-workers who associate with me by intimidations, numerous petty discipline charges, re-

---

  back injuries.

[13]   Plaintiff faults Defendants for seeking counsel from the County's lawyers rather than its ADA specialist.

>arranging our work area to make it uncomfortable etc.  When the county was notified in August by EEOC, things got much worse to the point that individuals are fearful of being seen with me during break or on lunch hours, and policing our daily activities.  These actions are not taken on other employees.[14]

A right to sue letter was issued on February 1, 2005.  Plaintiff filed a third EEOC charge on April 22, 2005.  The third charge generally laid out the history of her employment with the County, including the doctor's notes, hiring of Smith, handicapped parking incident and the County's refusal to accommodate her disability.  This lawsuit was filed on April 29, 2005.

**STANDARD OF REVIEW**

In accordance with Federal Rule of Civil Procedure 56, summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *LaPointe v. UAW Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

>[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323.  A fact is material only if its resolution might affect the outcome of the lawsuit under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party pursuant to Federal Rule of Civil Procedure 56(e), which provides:

---

[14] Plaintiff has provided affidavits of other employees explaining that they were disciplined while with Plaintiff or were fearful of being disciplined while associating with Plaintiff.

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

In ruling upon the motion, the court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party.  *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995); *United States v. Hodges X-Ray, Inc.*, 759 F.2d 557, 562 (6th Cir. 1985).  However, "[t]he nonmoving party must come forward with some significant probative evidence to support its claim.  If the nonmoving party fails to make a sufficient showing on an essential element, which it has the burden of proof, the moving party is entitled to summary judgment."  *Brumbalough v. Camelot Care Centers, Inc.*, 427 F.3d 996, 1001 (6th Cir. 2005) (citing *Celotex*, 477 U.S. at 323-24).

**DISCUSSION**

Motion to Strike and Evidentiary Issues

Defendants seek to strike a number of affidavits, deposition transcripts and other documents on the basis that they were filed after the time required by Local Rule 7.1(d).  Other than Plaintiff's declaration (Doc. 90), all of the documents at issue were filed one day late.  Although the Court does not look favorably upon such tardy filings, striking the documents is an extreme penalty which is not justified in this instance.

Defendants also argue that the affidavits of Opdyke, Nemeth and Vasi should be stricken because they were withheld during discovery.  Defendants submitted document requests seeking witness statements.  All of the affidavits are dated prior to the date responsive documents were

11

due. Plaintiff generally responds that the affidavits were work product, citing to Rule 26(B)(3) and *Hickman v. Taylor*, 329 U.S. 495 (1947). Defendants respond that Plaintiff failed to provide a privilege log as to the statements, prejudicing Defendants. However, Defendants do not make any argument that the statements were not in fact work product. Accordingly, they will not be stricken.

Defendants next argue that Pleban's declaration should be stricken as self-serving, inconsistent with prior testimony and containing hearsay. To the extent it includes directly contradictory statements or hearsay, the Court will not consider those matters. However, this does not justify striking the entire declaration.

Defendants also challenge as hearsay a number of items that were submitted with Plaintiff's opposition brief. They are correct that many of Plaintiff's medical records are hearsay and were not authenticated as required to demonstrate a hearsay exception. They are also coreect that typed statements of third parties are hearsay and no exception has been demonstrated. However, photographs taken by Plaintiff (though not the attached comments) are admissible.

Motion for Summary Judgment

Count I of Plaintiff's Complaint alleges retaliation in violation of Ohio R.C. § 4112.02. Count II alleges retaliation and disability discrimination in violation of 42 U.S.C. § 12111, *et seq.* Count III alleges disability discrimination under Ohio R.C. § 4112.02.[15] Count IV, which

---

[15] The parties first dispute whether Defendants properly moved for summary judgment on the retaliation claims. The Court finds that Defendants specifically moved for summary judgment as to all counts and their arguments apply equally to the retaliation claims. The Court therefore agrees with Defendants that their motion

Plaintiff has decided to dismiss, alleges a Section 1983 claim.

Because Ohio's disability laws are modeled on the Americans with Disabilities Act (ADA) it is appropriate to analyze Plaintiff's state and federal claims simultaneously. *Columbus Civil Serv. Comm'n v. McGlone*, 697 N.E.2d 204, 206-07 (Ohio 1998); *Pinchot v. Mahoning County Sheriff's Dep't*, 843 N.E.2d 1238, 1241 (Ohio App. 2005). Both state and federal law expressly prohibit employment discrimination on the basis of a person's disability. Ohio R.C. § 4112.02(A); 42 U.S.C. § 12112(a). A disability is defined as follows:

> "Disability" means a physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working; a record of a physical or mental impairment; or being regarded as having a physical or mental impairment.

Ohio R.C. § 4112.01(A)(13); *see also* 42 U.S.C. § 12102(2) (defining "disability"); 29 C.F.R. 1630.2 (g)-(j) (defining "disability," "physical or mental impairment," "major life activity," and "substantially limits").

An employer must provide reasonable accommodations to a "qualified individual with a disability" unless the employer can prove that the accommodation would pose an undue hardship. *Toyota Motor Mfg., Ky. v. Williams*, 534 U.S. 184, 193 (2002); 42 U.S.C. § 12112(b)(5)(A). A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."[16] 42 U.S.C. § 12111(8). Both the

---

applies to all of Plaintiff's claims.

[16] Defendants did not move on whether lifting items in excess of Plaintiff's limitations is an essential function of the employment position or whether reasonable accommodations were available to

employee and the employer are expected to engage in an interactive process to assess the employee's limitations and the reasonable accommodations available to overcome those limitations. *Beck v. University of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996); 29 C.F.R. § 1630.2(o)(3). The failure to participate in the interactive process in good faith and with reasonable effort can both create and preclude liability. *Beck*, 75 F.3d at 1135-36.

Defendants' Motion for Summary Judgment challenges whether Plaintiff is disabled and whether she participated in the interactive process. Both of these are threshold issues that would bar the discrimination and retaliation claims. Before reaching these issues, however, the Court must first determine whether Plaintiff's claims are timely.[17] Federal law requires employees to first bring their discrimination claims before the EEOC. 42 U.S.C. § 12117(a); 42 U.S.C. § 2000e-5. Once the EEOC issues a right to sue letter, the employee must file a civil action within 90 days. 42 U.S.C. § 2000e-5; *Seay v. TVA*, 339 F.3d 454, 469 (6th Cir. 2003).

Defendants note that Plaintiff failed to bring a claim related to the August 23, 2004 EEOC action within 90 days of receiving a right her right to sue letter on December 3, 2004.[18]

---

perform that function.

[17] Defendants also argued in their initial brief that the Court cannot review Plaintiff's claim regarding the summer 2004 leave because the issue of the leave was submitted to arbitration. Plaintiff responds that her statutory claims are independent from any arbitration. Defendants do not dispute this but instead reply that the Court cannot review the arbitrator's decision. Because the Court has not been asked to review Plaintiff's rights under the collective bargaining agreement, Defendants' argument is inapposite.

[18] Defendants also argue that Plaintiff failed to raise the handicapped parking permit incident in an EEOC charge. However, the parking lot incident was raised in the April 22, 2005 charge.

Because her Complaint was filed on April 29, 2005, the Court agrees.  Nonetheless, the incidents related to the August 23 EEOC action may still be admissible as background evidence in support of the timely claims.  *AMTRAK v. Morgan*, 536 U.S. 101, 113 (2002).   Finally, Plaintiff correctly argues that her Ohio discrimination claims are not barred, since Ohio has a lengthy limitations period and does not require exhaustion of administrative remedies.  Defendants have not disputed these points.

Moving to the merits, the Court will first address whether Plaintiff is substantially limited in a major life activity such that she is disabled.  Both federal and state authorities define a major life activity as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. 1630.2(i); *see also* Ohio R.C. § 4112.01(A)(13).  Plaintiff can see, hear, speak, breathe and learn.  Defendant has also  provided an extensive list of activities that Plaintiff has admitted she is capable of performing on a daily basis, such as driving, shopping, playing with dogs, gardening, boating, fishing and camping. With respect to her ability to work, Plaintiff applied for over 50 computer-related jobs after her employment with the County ended.  She also testified that she doesn't believe she is disabled.

Plaintiff responds that the central inquiry is whether lifting is a major life activity.  Both state and federal law define a major life activity as including functions "<u>such as</u> caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. 1630.2(i) (emphasis added).  Thus, there are a number of other activities that are considered major life activities, including lifting.  *See House v. Kirtland Capital Ptnrs.,* 819 N.E.2d 65, 71 (Ohio App. 2004) (holding that "appellant's inability to lift objects does constitute a major life activity"); *Smith v. Quikrete Cos.,* 204 F. Supp. 2d 1003, 1008 (D. Ky.

15

2002) (quoting *Henderson v. Ardco, Inc.*, 247 F.3d 645, 650 (6th Cir. 2001), for the proposition that a major life activity "arguably could include lifting").

The employee must also be "substantially limited" in that major life activity. This requires a fact-specific inquiry into each individual's limitations. *Williams*, 534 U.S. at 199. "[A]n individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long-term." *Id.* at 198. Courts have rejected claims that the inability to lift large weights such as 25 pounds meets this standard. *Quikrete Cos.,* 204 F. Supp. 2d at 1008.

However, Plaintiff has presented evidence that she cannot lift more than seven pounds. The County recognized that she could not lift over seven pounds in the 2002 Fogt letter. According to her affidavit, this condition exists to this day and she is significantly challenged in lifting items that weigh even five pounds. This affects her not only at work but at home. *Williams*, 534 U.S. at 200-201 ("When addressing the major life activity of performing manual tasks, the central inquiry must be whether the claimant is unable to perform the variety of tasks central to most people's daily lives, not whether the claimant is unable to perform the tasks associated with her specific job."). Plaintiff has provided a list of activities that she has difficulty performing—such as carrying a vacuum cleaner, bowling, performing most exercises, scrubbing walls, hanging pictures, moving small pieces of furniture and obtaining items from high shelves—many of which demonstrate an inability to do even simple tasks in her day-to-day life.

Based on the evidence presented there is a genuine issue of material fact whether Plaintiff

16

is substantially limited in a major life activity.  She has presented evidence that she is unable to lift even small items and that she is unable to perform a variety of tasks central to most people's lives.  Although there is also some evidence that she is able to perform a number of such tasks, Defendants have not made a sufficient showing to meet their burden on summary judgment.

Defendants' next argument is that Plaintiff failed to participate in the interactive process.  When Plaintiff was placed on leave the County asked her to obtain a current medical examination.  Instead of doing so, Plaintiff and her Union repeatedly asserted that she did not have any disability that prohibited her from doing her job.  Although Plaintiff claims that these statements were correct because she understood her job not to require lifting or climbing, this was in response to a letter where the County specifically laid out the physical tasks it felt she could not perform.  To respond that she could physically perform her job without mentioning that the definition of her job did not include those tasks is evidence of her lack of cooperation.

Even so, a reasonable juror could conclude that it was in fact the County that did not participate in the interactive process.  The County did not seek the medical assessment to determine what accommodations it might make.  Instead, the County wanted Plaintiff to deliver a clean bill of health requiring no accommodations if she wished to keep her job.  This was despite the fact that the County had granted Plaintiff accommodations for years beforehand.  This evidence that the County was simply refusing to determine what accommodations might be available precludes summary judgment in the County's favor.

**CONCLUSION**

For the foregoing reasons, the Court DENIES Defendants' Motion for Summary Judgment.  Defendants' Motion to Strike is GRANTED IN PART and DENIED IN PART.

IT IS SO ORDERED.


/s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge


Dated:  7/12/06